UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

EDNA R. DUTTON, as Administrator of the Estate of Bartow C. Dutton,

Plaintiff,

v.     6:13-cv-58

UNITED STATES OF AMERICA,

Defendant.

## ORDER

### I. INTRODUCTION

Before the Court are the United States of America's Motion to Exclude Expert Testimony and for Summary Judgment, ECF No. 50, and Edna R. Dutton's Motion to Allow Additional Expert, ECF No. 52.

Edna R. Dutton ("Plaintiff"), as administrator of the estate of her deceased husband, Bartow C. Dutton ("Mr. Dutton"), seeks damages from the United States of America ("Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, alleging that the negligence of the doctors and staff of the Charlie Norwood Veterans Administration Medical Center ("VAMC") caused Mr. Dutton "serious personal injuries which caused permanent impairment, loss of his entire right leg, and disfigurement." ECF No. 1 at 10. The Government argues that Plaintiff's proffered expert is not competent to testify under O.C.G.A. § 24-7-702(c) and that, therefore, Plaintiff cannot make out a claim of medical malpractice under Georgia law, thus entitling the Government to summary judgment. ECF No. 50 at 19.

For the reasons set forth below, the Court agrees with the Government and *GRANTS* the Government's Motion to Exclude Expert Testimony and for Summary Judgment and *DENIES* Plaintiff's Motion to Allow Additional Expert.

### II. BACKGROUND

In the early morning hours of May 24, 2010, Mr. Dutton was admitted to VAMC after complaining of abdominal pain and several episodes of vomiting and loose stool. ECF Nos. 50-1 at 4; 50-2 at 869; 56-1 at 5. On May 28, 2010, a CTA of Mr. Dutton's abdomen revealed "[f]indings concerning for mesenteric ischemia," a potentially life-threatening condition. ECF Nos. 50-1 at 4; 50-3 at 662; 50-9 at 33-34; 56-1 at 5. Subsequent colonoscopy and endoscopy results were consistent with the CTA findings. ECF Nos. 50-1 at 5; 50-2 at 701, 706-07; 56-1 at 5-6.

After Mr. Dutton continued to experience symptoms overnight on June 1-2, 2010, interventional radiologist Dr. David Riggans unsuccessfully attempted to stent Mr. Dutton's superior mesenteric artery. ECF Nos. 50-1 at 5; 50-2 at 703; 50-3 at 1549-56; 56-1 at 6. On the night of June 2, 2010, after Dr. Riggans's unsuccessful attempt to treat Mr. Dutton's mesenteric ischemia, Mr. Dutton began to feel as though he was losing blood flow to his right leg. *See* ECF 50-1 at 5; 50-2 at 683; 56-1 at 6. Nurses reported that Mr. Dutton's leg was cool to the touch, and Mr. Dutton reported loss of sensation and a burning

feeling in his right leg. ECF No. 50-1 at 5; 50-2 at 683-84; 56-1 at 6-7.

Vascular surgery was then called to evaluate Mr. Dutton's condition. ECF Nos. 50-1 at 6; 56-1 at 7. The assessment was that Mr. Dutton had developed a blood clot in a bypass graft in his right leg. *See* ECF 50-2 at 679. However, in light of Mr. Dutton's active issues with mesenteric ischemia, the vascular surgery team, led by Dr. Manuel F. Ramirez, elected to treat Mr. Dutton's clotted bypass graft conservatively and instructed him to hang his leg off the side of the bed. *Id.* at 679. The medical staff at VAMC continued to monitor Mr. Dutton's leg overnight. ECF Nos. 50-1 at 6; 56-1 at 7.

On the morning of June 3, 2010, Mr. Dutton's right leg remained pulseless and cold to the touch. ECF Nos. 50-1 at 6; 50-2 at 676; 56-1 at 7-8. At that point, the "general consensus was to proceed with a repeat aortogram with the intent to revascularize the celiac trunk and proceed with lytic therapy of [Mr. Dutton's] thrombosed [right leg]." ECF Nos. 50-1 at 6-7; 50-2 at 669. Then, after placement of a catheter for lytic infusion, Dr. Ramirez transferred Mr. Dutton to the Medical College of Georgia ("MCG") to continue lytic therapy under ICU supervision. ECF Nos. 50-1 at 7; 50-2 at 662; 56-1 at 8. After anticoagulation therapy was unsuccessful, physicians at MCG made the decision to amputate Mr. Dutton's right leg "[i]n light of [Mr. Dutton's] mesenteric ischemia and risk of having acute dead bowel presentation masked by the right lower extremity problems." ECF 50-1 at 7; 50-6 at 3; 56-1 at 8. This amputation occurred on June 6, 2010. ECF Nos. 50-1 at 7; 56-1 at 8.

On May 22, 2013, Plaintiff and Mr. Dutton filed the complaint in this case, alleging that that the negligence of VAMC physicians and staff in failing to treat the emergent ischemia in Mr. Dutton's right leg caused the eventual amputation of that leg. ECF No. 1 at 9-10. On August 19, 2013, Mr. Dutton died, *see* ECF No. 17, and Plaintiff is now party to the case individually and as administrator of Mr. Dutton's estate. *See* ECF No. 31.

The Court previously found that Dr. Riggans was an independent contractor and, therefore, Plaintiff may not recover from the Government for his actions. ECF No. 49. Accordingly, the remaining basis for Plaintiff's medical malpractice claim is VAMC's delay in treating Mr. Dutton's ischemic right leg on June 2, 2010, which Plaintiff believes was unreasonable. *See* ECF Nos. 1 at 9-10; ECF No. 45 at 8; 50-1 at 2; 56-1 at 3.

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on summary judgment, the Court views the facts and inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008). Courts, moreover, may consider all materials in the

record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Reese*, 527 F.3d at 1268 (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The nonmoving party then "may not rest upon the mere allegations or denials of [its] pleading[s], but . . . must set forth specific facts showing that there is a genuine issue for trial." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

## IV. ANALYSIS

"Liability in an FTCA action is determined in accordance with the law of the place where the government's act or omission occurred, which in this case is [Georgia]." *See Stevens v. Battelle Mem. Inst.*, 488 F.3d 896, 899 n.3 (11th Cir. 2007). Thus, the FTCA requires that the whole law of Georgia be applied to Plaintiff's medical malpractice claim. *See Gonzalez-Jiminez De Ruiz v. United States*, 378 F.3d 1229, 1230 n.1 (11th Cir. 2004).

In medical malpractice cases under Georgia law, plaintiffs must prove: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003) (quotation omitted). In order to prove "'a violation of the applicable medical standard of care [and] also that the purported violation [of] or deviation from the proper standard of care is the proximate cause of the injury sustained,'" Plaintiff must provide expert testimony. *Porter v. Guill*, 681 S.E.2d 230, 235 (Ga. Ct. App. 2009) (quoting *MCG Health, Inc. v. Barton*, 647 S.E.2d 81, 86 (Ga. Ct. App. 2009)).

Thus, to withstand the Government's motion for summary judgment, Plaintiff must produce expert medical testimony that establishes, to a "reasonable degree of medical certainty," that the Government's "purported violation or deviation is the proximate cause of" Mr. Dutton's injuries. *See Beasley v. Northside Hosp., Inc.*, 658 S.E.2d 233, 236-37 (Ga. Ct. App. 2008). In the absence of such testimony, there is no issue of material fact and Plaintiff cannot weather a motion for summary judgment. *Id.*

### A. Expert Testimony, Federal Rules of Evidence, and O.C.G.A. § 24-7-702

Where, as here, state law governs the substantive issues of the case, federal law still governs procedural matters in federal

court. *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). "Rules of procedure encompass rules of evidence, and therefore, the Federal Rules of Evidence, not state evidentiary laws, apply." *Id.* In general, "the admissibility of expert testimony is a matter of federal, rather than state procedure." *See id.* at 1294-95.

Plaintiff argues that, because this case arises under federal law, O.C.G.A. § 24-7-702, governing qualifications of experts in Georgia civil proceedings, does not apply and the Court need only apply Federal Rules of Evidence in determining the admissibility of expert testimony. *See* ECF No. 56 at 3. But in *McDowell v. Brown*, the Eleventh Circuit held that Georgia's expert competency rules apply where a federal court exercises supplemental jurisdiction over a state law claim. *McDowell*, 392 F.3d at 1294-95. There, the Eleventh Circuit found that Georgia's expert competency rule is really "substantive in nature, and transcend[s] the substance-procedure boundary creating a potential *Erie* conflict." *Id.* at 1295. Relying on the Sixth Circuit's decision in *Legg v. Chopra*, 286 F.3d 286 (6th Cir. 2002), the Eleventh Circuit concluded that "'state witness competency rules are often intimately intertwined with a state substantive rule [and that] [t]his is especially true with medical malpractice statutes, because expert testimony is usually required to establish the standard of care.'" *Id.* (quoting *Legg*, 286 F.3d at 290). Therefore, a determination of expert competency under Georgia law was required as a prerequisite to expert screening under Federal Rule of Evidence 702. *Id.*

Though the Eleventh Circuit has not considered whether the same is true in cases arising under the FTCA, the Court finds that the rationale in *McDowell* applies equally to FTCA cases. In doing so, the Court concludes that this finding comports with Federal Rule of Evidence 601's mandate that "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law applies the rule of decision," while not offending Federal Rule of Evidence 702's governance of the admissibility of expert testimony. *See* 27 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6003, at 32 (2d ed. 2007) ("[O]ne key to establishing the scope of Rule 601 is to distinguish between competency and admissibility. . . . [A] witness might be able to offer testimony that is admissible, but that witness still is prevented from taking the stand if [she is not competent to testify]."); *see also Liesback v. United States*, 731 F.3d 850, 855-57 & n.4 (9th Cir. 2013) (citing *McDowell*, 392 F.3d at 1294-96) (applying state statute governing expert competency in medical malpractice cases in an FTCA case).

Therefore, the Court finds that, through Federal Rule of Evidence 601, O.C.G.A. § 24-7-702 applies in FTCA actions where Georgia's substantive law provides the rule of decision.

Under the *McDowell v. Brown* framework, admissibility of expert testimony in medical malpractice cases under Georgia law brought in federal court is a two-step inquiry. First, the Court must determine whether Plaintiff's expert is competent to testify as an expert in a medical malpractice case under O.C.G.A. §

4

24-7-702(c). *McDowell*, 392 F.3d at 1295. Second, Plaintiff's proffered expert testimony must "meet[] the strictures of Rule 702." *Id.* Because the Court finds that Plaintiff's proffered expert does not meet O.C.G.A. § 24-7-702(c)'s competency requirements, it does not reach the question of whether the proffered testimony passes muster under Rule 702.

### B. Expert Competency Under O.C.G.A. § 24-7-702(c)

To be competent to testify as an expert in a medical malpractice action under O.C.G.A. § 24-7-702(c), "the witness must (1) have actual knowledge and experience in the relevant area through either 'active practice' or 'teaching' *and* (2) either be in the 'same profession' as the defendant whose conduct is at issue or qualify for the exception to the 'same profession' requirement." *Hankla v. Postell*, 749 S.E.2d 726, 729 (Ga. 2013). The statute also requires that a proffered expert's "active practice" or "teaching" experience be "for at least three of the last five years." O.C.G.A. § 24-7-702(c)(2)(A)-(B).

As a preliminary matter, in order to accurately assess whether or not a proffered expert is competent to testify as to a breach of the standard of care, "'it is necessary . . . to accurately state both the area of specialty at issue and what procedure or treatment [is] alleged to have been negligently performed.'" *Toombs v. Acute Care Consultants, Inc.*, 756 S.E.2d 589, 593 (Ga. Ct. App. 2014) (quoting *Anderson v. Mountain Mgmt. Servs.*, 702 S.E.2d 462, 465 (Ga. Ct. App. 2010)). "[T]he area of specialty is dictated by the allegations in the complaint, not the apparent expertise of the [defendant] physician." *Id.*; *see also Spacht v. Troyer*, 655 S.E.2d 656, 659 (Ga. Ct. App. 2007) ("To determine 'the area of practice or specialty in which the opinion is to be given,' we look to the allegations of the plaintiff's complaint . . . ." (quoting *Barton*, 647 S.E.2d at 86)).

Thus, while it is not necessary that the proffered expert practice the same specialty as the defendant physician, it is essential that the expert actively practice the procedures and treatments alleged to have been performed negligently. *See Aguilar v. Children's Healthcare of Atlanta, Inc.*, 739 S.E.2d 392, 394-95 (Ga. Ct. App. 2013).

#### 1. Specialty at Issue and Treatment Alleged to Have Been Negligently Performed

Based on the allegations contained in Plaintiff's Complaint, the Court finds that the relevant area of specialty at issue is managing the treatment of a patient suffering from critical ischemia. While vascular procedures, including vascular surgery, are at issue in the periphery, the primary treatment at issue is the management of an emergent leg ischemia in a patient with critical mesenteric ischemia. Specifically, the alleged negligence at issue is failing "to implement emergent medical care and treatment" when the vascular surgery team "noted that an acute thromboembolic event had occurred in Mr. Dutton's right leg." *See* ECF No. 1 at 9.

### 2. Dr. Michael A. Bettmann's Qualifications and Opinion

Plaintiff's proffered expert is Michael A. Bettmann, M.D. He "is listed as an expert in the field of Vascular and Interventional Radiology." ECF No. 45 at 1. He states that he is "familiar with the standard of care . . . which physicians, nurses, physicians assistants and other medical practitioners must exercise in the care of patients generally, and when providing operative and post-operative care for patients who have undergone Interventional Radiological procedures." *Id.* at 4.

Dr. Bettmann is licensed to practice medicine in North Carolina, as well as in other states. *Id.* at 3. As for certifications, he is "Board Certified in Vascular and Interventional Radiology" and he has "extensive knowledge and experience" in that field. *Id.* He is not board certified in vascular surgery and has not had any direct training in vascular surgery. ECF No. 50-9 at 20. Rather, Dr. Bettman's training focused heavily on interventional radiology. He graduated medical school in 1969, completed a year-long internship in pediatrics in 1970, was a resident in diagnostic radiology from July 1972 to 1975, and finally completed a three-year fellowship in cardiovascular and interventional radiology in 1978. ECF Nos. 45 at 13; 50-9 at 20-22.

Dr. Bettmann is currently a Professor Emeritus at Wake Forest University School of Medicine, *see* ECF No. 50-9 at 9, and previously was a full-time professor teaching Radiologic Sciences. ECF No. 45 at 13. As far as recent clinical work, Dr. Bettmann currently is a consultant on issues of clinical decision support but is not actively seeing patients. ECF No. 50-9 at 24. Previously, he worked at Wake Forest from 2005 to 2012 as an interventional radiologist and as head of Cardiovascular Interventional Radiology. *Id.* at 25-26. During that time, Dr. Bettmann performed interventional procedures daily, estimating that an average day consisted of ten to twelve such procedures. *Id.* at 26. He saw both scheduled patients and emergent patients. *Id.* at 27. He also consulted with emergency room physicians, inpatient physicians, and vascular surgeons. *Id.* at 27-30.

After review of Mr. Dutton's VAMC medical records and diagnostic tests, Dr. Bettmann concluded that there was an "unreasonable delay in treating Mr. Dutton's emergent thrombosed right fem-popliteal artery" and expressed his medical opinion "that the [VAMC] and those in its employ, their staff and physicians failed to conform to the standard of care ordinarily employed by comparable health care providers under the same or similar circumstances in their diagnosis and treatment of [Mr. Dutton]." ECF No. 45 at 8-9.

### 3. Dr. Michael A. Bettmann's Competency as an Expert

#### a. Dr. Bettmann Is Not Competent to Testify as to Non-Physician Conduct

As an initial matter, Dr. Bettmann is not competent to testify as to the conduct of non-physician VAMC employees. As was previously explained, under Georgia law

6

experts in medical malpractice suits generally must be "in the 'same profession' as the defendant whose conduct is at issue." *Hankla*, 749 S.E.2d at 729. While there is an exception to this general rule that allows expert physicians to testify as to non-physician conduct, the exception applies "only if [the proffered expert] has knowledge regarding the relevant standard of care as a result of having . . . supervised, taught, or instructed such non-physician health care providers." *Id.* (alteration in original) (internal quotation marks omitted).

But Plaintiff has offered no evidence tending to show that the exception applies here. There is nothing in the record showing that Dr. Bettmann taught, supervised, or instructed non-physician health care providers. Rather, Dr. Bettmann merely asserts that he is familiar with the standard of care of those non-physician health care providers generally. *See* ECF No. 45 at 4. It is true that Dr. Bettmann was the head of Cardiovascular Interventional Radiology at Wake Forest, *see* ECF No. 50-9 at 25-26, but there is no indication in his deposition testimony or in his curriculum vitae whether or not he supervised or instructed non-physician health care providers. While it is possible that he did supervise or instruct non-physician staff during his time as a department head, Dr. Bettmann makes no reference to it, let alone reference to such supervision during O.C.G.A. § 24-7-702(c)'s relevant five-year time period.

In the absence of such evidence, the Court cannot find that Dr. Bettmann is competent to testify as to the conduct of non-physician VAMC staff members. *See Anderson*, 702 S.E.2d at 466 (upholding a trial court's determination that a doctor was not competent to testify as to the conduct of nurses where there was no "information in the record to show that for three of the five years prior to [the alleged occurrence, the doctor] 'supervised, taught, or instructed nurses . . . .'" (second alteration in original)).

### b. Dr. Bettmann Is Not Competent to Testify as to the VAMC Physicians' Conduct

Plaintiff argues that Dr. Bettmann is qualified to testify as to the VAMC physicians' conduct under O.C.G.A. § 24-7-702 "because he has the same profession as the VA physicians, i.e. a medical doctor." ECF No. 56 at 4. But whether or not Dr. Bettmann is a member of the same profession as the defendants is but one of O.C.G.A. § 24-7-702(c)'s requirements.

A proffered expert must also have actual knowledge and experience in the relevant area of practice at issue. Only doctors with the requisite knowledge and experience in the relevant area of practice are "authorized to judge another doctor's performance in that area of practice," because to permit otherwise "would eviscerate [O.C.G.A. § 24-7-702(c)]'s purpose of assuring that a medical professional is not held negligent in the absence of evidence that he violated a standard of care established by his peers." *Hope v. Kranc*, 696 S.E.2d 128, 131 (Ga. Ct. App. 2010); *see also Emory-Adventist, Inc. v. Hunter*, 687 S.E.2d 267, 270 (Ga. Ct. App. 2009) (finding it "clear that the words 'active practice' . . . relate to practice in an area of medical specialty showing expertise

7

therein not licensure to practice medicine generally"). Here, the relevant area of specialty at issue is managing the care of a patient suffering from critical ischemia.

According to Dr. Bettmann's deposition testimony, he is certified in vascular and interventional radiology, but has not received any formal training in vascular surgery. ECF No. 50-9 at 18, 20. Thus, while Dr. Bettmann is familiar generally with the standard of care physicians must exercise "when providing operative and post-operative care for patients who have undergone Interventional Radiological procedures," see ECF No. 45 at 4, Plaintiff has not provided any evidence tending to show that Dr. Bettmann is familiar with managing the treatment of critically ill vascular patients. See ECF Nos. 50-9 at 20; 56-1 at 11, ¶ 60. To be sure, Dr. Bettmann testified only that he had experience consulting with vascular surgeons regarding specific procedures, not that he actually managed the care of those patients himself. See ECF No. 50-9 at 27-30.

Further, Dr. Bettmann testified that he has never performed open surgeries for deep vein thrombosis or arterial occlusion. ECF No. 50-9 at 40.[1] According to Dr. Bettmann's deposition testimony, interventional radiologists, unlike vascular surgeons who receive training in both interventional radiology and vascular surgery, are not trained to perform open surgeries. See id. at 23-24.

This lack of training in vascular surgery is important, because Dr. Bettmann alleges that the VAMC physicians' care fell below the standard of care when the physicians failed to treat the emergent ischemia that developed in Mr. Dutton's right leg after the failed attempt to stent his superior mesenteric artery. See id. at 86. Dr. Bettmann testified that, at that point, the VAMC physicians had the opportunity to perform a procedure to save Mr. Dutton's leg. Id. This is significant, because while Dr. Bettmann testifies as to his experience in interventional radiology procedures, see id. at 20-26, he does not testify as to any experience in managing the course of treatment for critically ill patients. Again, the extent of Dr. Bettmann's testimony regarding such decisions is that he has consulted with vascular surgeons regarding specific procedures, not about general courses of treatment. See id. at 27-30.

In Mr. Dutton's case, according to a progress note dated June 2, 2010, at 11:35 PM, the VAMC vascular surgery team assessed the worsening condition of Mr. Dutton's right leg and concluded that, "[g]iven[] patient's active issues with mesenteric ischemia and GI bleed, he has a strong contraindication to anticoagulation." ECF No. 50-2 at 679. Therefore, the VAMC physicians opted to treat Mr. Dutton with "conservative measures." Id.

---

[1] Later in Dr. Bettmann's deposition, he testified that he had performed open thrombectomy surgeries. See ECF No. 50-9 at 110. Plaintiff seizes on this inconsistency to refute the Government's contention that Dr. Bettmann never performed open vascular surgeries. See ECF No. 56-1 at 8. However, even if Dr. Bettmann's testimony is accepted as true, it is irrelevant to the Court's inquiry here. He testified that the open surgeries he allegedly performed were during his fellowship. See ECF No. 50-9 at 110. Dr. Bettmann's fellowship ended in 1978, ECF No. 45 at 13, far and away outside of O.C.G.A. § 24-7-702(c)'s five-year window for relevant experience.

8

Dr. Bettmann does not disagree with the VAMC physicians' conclusion regarding Mr. Dutton's contraindication to anticoagulation. *See* ECF No. 50-9 at 86 ("I think you could make a good point about the contraindication . . . ."). However, his opinion is that, given the worsening condition of Mr. Dutton's leg, something had to be done within four to six hours in order to avoid amputation. *See id.*

Dr. Bettmann testified that, in his opinion, the VAMC physicians had two interventional options at their disposal: 1) lytic therapy—a procedure Dr. Bettmann has experience with—and 2) surgical thrombectomy. *Id.* Although Plaintiff argues, without citation to the deposition transcript, that "Dr. Bettmann testified that the lytic therapy for the thrombosis should have been performed . . . ," *see* ECF No. 56 at 6-7, Dr. Bettmann's deposition belies this argument. Dr. Bettmann believes that although lytic therapy was something that could be considered, he did "not say[] that [it was] something that should be done." *See* ECF No. 50-9 at 87.

As an alternative to lytic therapy, Dr. Bettmann testified that the VAMC physicians could have done "a surgical thrombectomy" on Mr. Dutton's leg. *Id.* at 88. But Dr. Bettmann has never done a thrombectomy surgery on a patient like Mr. Dutton, *see id.* at 111, and does not know how difficult or complicated such a surgery would be on a patient with Mr. Dutton's history. *See id.* at 88-89. Indeed, Dr. Bettmann admits that he is not in a position to determine how complicated or difficult a thrombectomy surgery would have been in Mr. Dutton's case, because that decision is "up to the surgeon" and Dr. Bettmann acknowledges he is "not a surgeon." *See id.*

Thus, while agreeing that starting lytic therapy was not necessarily something that the VAMC physicians should have done due to Mr. Dutton's contraindication to anticoagulation treatments, Dr. Bettmann asserts that conducting a surgical thrombectomy was "definitely a procedure that [was] within the standard of care in [Mr. Dutton's situation]." *Id.* at 89. But, in reality, Dr. Bettmann has no knowledge as to "how hard or easy it would have been in Mr. Dutton." *See* ECF No. 50-9 at 89.

To summarize Plaintiff's proffered expert testimony: Dr. Bettmann's opinion is that VAMC physicians were negligent in failing to intervene within four to six hours of the development of critical ischemia in Mr. Dutton's right leg, despite the fact that he has no knowledge or experience in conducting the type of procedure he offers as an alternative to administering anticoagulation therapy, which he agrees should not necessarily have been undertaken in Mr. Dutton's situation. But, flatly, Dr. Bettmann's opinion either fails to appreciate or ignores the clinical context in which the VAMC physicians made decisions as to Mr. Dutton's treatment.

According to Jacob G. Robison, M.D., the Government's proffered expert and a vascular surgeon, Mr. Dutton "had a very difficult and challenging problem from the beginning" due to the "simultaneous compromise of circulation both to the right leg and the intestine." ECF No. 46 at 2. Dr. Ramirez, the vascular surgeon handling Mr. Dutton's treatment, testified that he

9

diagnosed Mr. Dutton's right leg as "critical" and "ischemic." ECF No. 65 at 85. Dr. Bettmann does not dispute that the VAMC physicians' made the proper diagnosis. *See* ECF No. 50-9 at 101. Thus, this is not a case where the VAMC physicians simply failed to recognize that Mr. Dutton's critically ischemic leg could be lost.

Rather, despite the diagnosis of a critically ischemic leg, Dr. Ramirez testified that he had essentially two options: 1) to aggressively treat Mr. Dutton's leg through surgery or blood thinners; or 2) to conservatively treat Mr. Dutton and hope that he could hold on to his leg until such time that more aggressive treatment was safe. *See* ECF No. 65 at 85. After opting not to engage in lytic therapy due to the risks of a massive bleed, *id.* at 86, Dr. Ramirez ruled out thrombectomy surgery due to the unique complications that Mr. Dutton's extensive history of vascular surgeries and revascularizations presented. *Id.* at 86-87, 94. Instead, in light of Mr. Dutton's ability to withstand ischemic episodes in his leg in the past, Dr. Ramirez opted for conservative treatment as the best means to preserve both Mr. Dutton's life and limb. *See id.* at 85. Dr. Robison's assessment tracks with Dr. Ramirez's in that "bleeding may have been exacerbated by the clot-dissolving therapy" and "concerns about the bowel preempted any attempt to save the leg with a long, complex surgery." *See* ECF No. 46 at 3.

Dr. Bettmann's use of generalities betrays his lack of understanding of the clinical situation Mr. Dutton's case presented. Focusing on symptoms of Mr. Dutton's ischemic leg, Dr. Bettmann opines that the limb ischemia was "an emergency that [had] to be dealt with in no more than four to six hours" or else "you c[ould] essentially guarantee that" Mr. Dutton would lose his leg. *See* ECF No. 50-9 at 86. Dr. Ramirez does not disagree with this "general dictum[]" that "everybody knows." ECF No. 65 at 63. But in a patient like Mr. Dutton, presenting with both mesenteric ischemia and limb ischemia, the general dictums must be put into context. *Id.* The fact that procedures were available to save Mr. Dutton's leg does not necessarily mean that failing to act was negligent. Rather, focusing only on the leg shows that Dr. Bettmann is approaching the standard of care at issue here as an interventional radiologist rather than as a clinician, like a vascular surgeon would. As Dr. Ramirez testified, "[t]here's a big divide between interventional radiologist and a vascular surgeon. They're very technical. [Vascular surgeons] are not only technical, but . . . are also the patient's doctor. [Vascular surgeons are] the clinician[s]." *Id.* at 63.

Thus, the Court finds the fact that Dr. Bettmann is not a vascular surgeon is fatal to his competency to testify as to the standard of care at issue in this case. To be sure, as Plaintiff correctly points out, "O.C.G.A. § 24-7-702 does not require the expert to have the same specialty as the defendant." ECF No. 56 at 4; *see also Spacht*, 655 S.E.2d at 657 ("An expert testifying about the standard of care in a medical malpractice case need not actively practice in the same specialty or practice area as the defendant doctor."). But what is necessary is that the proffered expert has actual professional

knowledge and experience in the practice or specialty he is to testify to. *See Aguilar*, 739 S.E.2d at 394-95. Thus,

> the legislature has allowed for an overlap in specialties, whereby an otherwise qualified medical doctor belonging to "Specialty A" can render an opinion about the acts or omissions of another medical doctor belonging to "Specialty B"—so long as the opinion of the expert witness belonging to "Specialty A" pertains to Specialty A.

*Cotten v. Phillips*, 633 S.E.2d 655, 657 (Ga. Ct. App. 2006).

According to this principle, Dr. Bettmann, as an interventional radiologist, could testify as to Dr. Ramirez's conduct in performing an interventional radiology procedure—e.g., lytic therapy. However, what Dr. Bettmann is not competent to testify to is Dr. Ramirez's conduct in making clinical decisions in how to proceed with treatment, especially when Dr. Bettmann has no knowledge or experience regarding one of two procedures that were available.

As Dr. Robison explains:

> Dr. Bettmann is an interventional radiologist. Although there is some overlap with vascular surgeons in the use of catheters, wires, stents, and intravascular medication such as lytic agents in management of some arterial problems, in general, interventional radiologists are not trained as vascular surgeons and have no experience with the surgical judgment and techniques required to manage patients with a complex arterial problem in the context of a life threatening situation.

ECF No. 46 at 4.

Plaintiff therefore misses the mark by focusing on what procedures were or were not done. *See* ECF No. 56 at 6-7. The fact that Dr. Bettmann, as an interventional radiologist, is competent to testify as to the performance of one of the procedures available to potentially treat Mr. Dutton really is of no moment. In order to testify as to the standard of care at issue here, Dr. Bettmann would have to be competent not as to the procedures available, but as to the clinical decision-making at issue. And to be competent to testify as to the decision-making at issue, Dr. Bettmann would have to have knowledge of the risks and difficulties involved with all available procedures.

Dr. Bettmann admits that he does not know the full extent of the difficulties of or the risks involved with the options available to Dr. Ramirez on the evening of June 2, 2010. *See* ECF No. 50-9 at 85-89. Nonetheless, his opinion is that Dr. Ramirez was negligent in not intervening to save Mr. Dutton's leg simply because there were procedures available that could have saved the limb. ECF No. 45 9-11. This is the kind of half-baked opinion that O.C.G.A. § 24-7-702 seeks to prohibit by "requir[ing] a plaintiff to obtain an expert who has significant familiarity with the area of practice in which the expert opinion is to be given." *Nathans v. Diamond*, 654 S.E.2d 121, 123 (Ga. 2007).

While it is true, as Plaintiff points out, that "it does not take a vascular surgeon to

know that a blood clot which prevents flow to a leg will cause that limb to die," ECF No. 56 at 7, what is dispositive here is that it takes a vascular surgeon to know when intervention to save the limb of a critically ill patient will not kill the patient in the process. Dr. Bettmann is not a vascular surgeon and he therefore is not competent to testify as to the clinical decisions that the VAMC physicians made regarding the course of Mr. Dutton's treatment. To permit an interventional radiologist to judge the clinical decisions of a vascular surgeon in this situation would "eviscerate" O.C.G.A. § 24-7-702(c)'s requirement that medical professionals be held negligent only when a peer, with significant familiarity with the defendant's area of practice, testifies that the defendant breached the established standard of care in that practice area. *See Hope*, 696 S.E.2d at 131.

### C. Plaintiff's Motion to Allow Additional Expert Witness

Perhaps recognizing the vulnerabilities of Dr. Bettmann's competency to testify under O.C.G.A. § 24-7-702(c), Plaintiff has filed a motion to allow an additional expert witness. ECF No. 52. However, under the Court's Scheduling Order, the last day for Plaintiff to furnish an expert witness report was June 15, 2014, and discovery closed on August 30, 2014. ECF No. 44 at 1. Thus, the Court will construe this late motion to allow an additional expert "as a request to modify the scheduling order." *See Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005).

Federal Rule of Civil Procedure 16 allows for modification of a scheduling order "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Rule 16's "good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airport Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam) (quoting Fed R. Civ. P. 16 advisory committee's note at Subdivision (b)). Thus, "'[a] finding of lack of diligence on the part of the party seeking modification ends the good cause inquiry.'" *Sanchez v. H&R Maint., L.C.*, 294 F.R.D. 677, 679 (S.D. Fla. 2013) (alteration omitted) (quoting *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1277 (M.D. Fla. 2002)).

Here, Plaintiff does not show any good cause warranting a modification of the Scheduling Order. At best, Plaintiff appears to allege undue surprise as Defendants had not previously objected to Dr. Bettmann's qualifications. *See* ECF No. 52 at 1. But Defendants' objection to Dr. Bettmann's proffered testimony, filed on September 23, 2014, was timely under the Court's Scheduling Order. *See* ECF No. 44 at 1 (setting a September 30, 2014, deadline for filing civil motions, including *Daubert* motions). Plaintiff does not explain why a diligent investigation regarding Dr. Bettmann's competency to testify as to the VAMC Physicians' conduct did not alert her to the weaknesses raised in the Government's motion to exclude his testimony.

Plaintiff's counsel knew testimony from a competent expert was necessary to sustain a claim under Georgia medical malpractice law and knew that the deadline for producing such an expert was June 15, 2014.

If the Court's order granting summary judgment to the Government on the issue of Dr. Riggans's status as an independent contractor, entered on July 30, 2014, affected Plaintiff's counsel's decisions regarding experts, counsel should have moved to secure an alternate expert, or for additional time to do so, prior to the close of discovery on August 30, 2014. However, absent an explanation regarding Plaintiff's failure to act sooner, the Court cannot grant Plaintiff's request to modify the Court's scheduling order. *See Argo v. Woods*, 399 F. App'x 1, 3 (5th Cir. 2010) ("Rule 16's fairly stringent 'good cause' standard . . . requires . . . a persuasive reason why the dates originally set by the scheduling order . . . could not 'reasonably be met despite the diligence of the party seeking extension.'") (quoting Fed. R. Civ. P. 16 advisory committee's note at Subdivision (b)). Indeed,

> [s]trict enforcement of the good cause requirement of Rule 16 may seem like unnecessarily strong medicine. But if the courts do not take seriously their own scheduling orders who will? The court cannot in good conscience ignore the clear authority applying the good cause requirement, particularly in a case, as here, where the party requesting relief offers no . . . persuasive reason to do so.

*Carnite v. Granada Hosp. Grp., Inc.*, 175 F.R.D. 439, 448 (W.D.N.Y. 1997).

To allow Plaintiff to avoid these deadlines merely because a motion for summary judgment has been filed on the grounds that she has failed to produce a competent expert "would render [the] scheduling order[] meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa*, 133 F.3d at 1419. The Court will not allow such a result.

### D. The Government is Entitled to Summary Judgment

Under Georgia law, "[t]o recover in a medical malpractice case, a plaintiff must demonstrate, by expert testimony, 'a violation of the applicable medical standard of care [and] also that the purported violation [of] or deviation from the proper standard of care is the proximate cause of the injury sustained.'" *Porter*, 681 S.E.2d at 235 (alteration in original) (quoting *MCG Health, Inc.*, 647 S.E.2d at 86). Because the Court has found that Plaintiff's expert is not competent to testify as to the applicable medical standard of care in this case, the Government is entitled to summary judgment. *See Bregman-Rodoski v. Rozas*, 616 S.E.2d 171, 173 (Ga. Ct. App. 2005) (upholding a trial court's grant of summary judgment where plaintiff failed to present competent expert testimony).

### E. Plaintiff's Request for Oral Argument

On November 10, 2014, Plaintiff requested oral argument regarding the Government's Motion for Summary Judgment arguing that the Government "has raised novel arguments regarding application of OCGA § 24-7-702 (Medical Expert Testimony) contrary to *Nathan* [sic] *v. Diamond*, 282 Ga. 804, 654 S.E.2d 121

13

(2007) that holds that OCGA § 24-7-702 is a 'procedural law.'" ECF No. 67. As such, Plaintiff argues that application of O.C.G.A. § 24-7-702 here is clear error. *See id.* In *Nathans*, the Supreme Court of Georgia determined that because O.C.G.A. § 24-7-702(c) "does not affect . . . substantive right[s] of action, as it does not change the standard of care to be applied or the measure of . . . recovery," the statute is procedural in nature and could therefore be applied retroactively. 654 S.E.2d at 125.

But as more fully explained above, the Eleventh Circuit in *McDowell* found that Georgia's medical malpractice expert testimony rule was, in reality, an expert competency rule which Federal Rule of Evidence 601 expressly incorporates into the federal rules in cases where, as here, "'State law supplies the rule of decision . . . .'" *See McDowell*, 392 F.3d at 1295 (quoting *Legg*, 286 F.3d at 290 (quoting Fed. R. Evid. 601)). The fact that the Supreme Court of Georgia concluded that O.C.G.A. § 24-7-702(c) is procedural for purposes of retroactivity, does not change the Eleventh Circuit's calculus in determining that the statute is so intimately intertwined with Georgia's medical malpractice laws so as to create an *Erie* conflict requiring its application in federal court where state law provides the rule of decision. Thus, this application of O.C.G.A. § 24-7-702 is neither novel nor clearly erroneous, but rather follows Eleventh Circuit precedent.

The Court is not opposed to granting requests for oral arguments and welcomes discussion with counsel when it finds that such conversation on the issues is fruitful towards aiding its decision-making. However, this is not an instance in which the Court's resources are well-spent in entertaining oral argument from the parties as the Court needs no aid in reaching its conclusion based on Eleventh Circuit precedent and the text of the Federal Rules of Evidence. Therefore, the Court denies Plaintiff's request for oral argument.

## V. CONCLUSION

The Court finds that under O.C.G.A. § 24-7-702(c), Plaintiff's proffered expert is not competent to testify as to the applicable standard of care at issue in this case and **GRANTS** the Government's Motion to Exclude Expert Testimony, ECF No. 50. Accordingly, Plaintiff's request for oral argument on this issue, ECF No. 67, is **DENIED**. Further, because Plaintiff has failed to show good cause warranting modification of the scheduling order, the Court **DENIES** Plaintiff's Motion to Allow Additional Expert, ECF No. 52.

Because a claim of medical malpractice under Georgia law requires expert testimony to establish the applicable standard of care and causation, Plaintiff's failure to produce competent expert testimony entitles the Government to summary judgment. Therefore, the Court **GRANTS** the Government's Motion for Summary Judgment, ECF No. 50.

This 25 day of November 2014.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

14